UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUJUAN MCCANTS,

               Petitioner,               Case No. 2:20-cv-13166
                                                  Hon. Denise Page Hood

v.

WILLIS CHAPMAN,

               Respondent.

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND (2) DENYING A CERTIFICATE OF APPEALABILITY

LuJuan McCants, a Michigan prisoner, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254. Following a jury trial in the Macomb Circuit Court, Petitioner was convicted of armed robbery, MICH. COMP. LAWS §750.529, first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), unlawful imprisonment, MICH. COMP. LAWS § 750.349b, unlawful driving away of a motor vehicle, MICH. COMP. LAWS § 750.413, possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f, and possession of a firearm when committing a felony, MICH. COMP. LAWS §750.227b. The trial court sentenced McCants to a controlling term of 280 to 480 months for the armed robbery and home invasion convictions, and lesser terms for the other offenses.

1

The habeas petition raises eleven claims: (1) the victim's identification testimony was tainted by a suggestive pretrial identification procedure, (2) trial counsel was ineffective for failing to investigate evidence held by police and for failing to interview the men found driving the victim's car, (3) the jury saw McCants in shackles during trial, (4) trial counsel was ineffective for additional reasons, (5) insufficient evidence was presented at trial to sustain McCants's convictions, (6) McCants was erroneously denied substitute counsel, (7) the prosecutor suppressed exculpatory evidence, (8) the trial court was biased, (9) seized cellphones were illegally searched, and (10) the trial court incorrectly instructed the jury.

The Court will deny the petition because the claims are without merit. The Court will also deny McCants a certificate of appealability.

## I. Background

The Michigan Court of Appeals summarized the evidence presented at McCants's jury trial:

> Defendant's convictions arise from a December 16, 2014 incident at the Mount Clemens home of Brenda Wilson. Wilson testified at defendant's trial that at around 5:00 or 5:30 p.m. she looked out the kitchen window of her mother's house, which is located diagonally from her own, and saw an unfamiliar car parked across the street with three black men and a black female inside. The female was driving and the male in the front passenger seat was wearing a brown Carhartt-style work jacket. Both of them kept looking up at her mother's kitchen window. Wilson identified defendant as the man in the work jacket.

Later that evening, Wilson drove her son, Randy, to his girlfriend's house, returning home at around 10:30 p.m. As she approached the side entrance of her house, three people ran up to her from behind the house, and one of them put a gun to her neck. Wilson testified that the gunman was wearing a mask, but she could see his eyes, and she recognized defendant as the man she had seen earlier that day in the car parked across the street from her mother's. Wilson said that defendant told her to be quiet and open the door, and he kept the gun to her neck until everyone got inside. He then had her go into the living room and sit on a loveseat. On defendant's instruction, one of the other robbers attempted to zip tie Wilson's hands behind her back. She said that the men turned on every light in the house and proceeded to rummage around in the bedrooms at the back of the house, as defendant kept yelling at them and asking her where the money and weed was located. Wilson said defendant was waving the gun around and saying he would kill her. One of the other men dumped Wilson's purse out on the table and removed two envelopes containing a total of $410. Wilson testified that in addition to the money, the robbers stole items that included a 42-inch television, all of her grandchildren's Christmas toys, a video game player, two shotguns, a hunting bow, a hunting seat, coats, a black and red hunting satchel, and a DVD-player. Once they finished, the robbers let Wilson move to a dining room chair, where one of them duct taped her legs together before they left with her keys, cellphone, and car. Using a knife that was on the table, Wilson freed herself and waited for the robbers to drive away. She then locked the side door and went out the back door to summon help from her neighbor.

Deputies from the Macomb County Sheriff's Department arrested defendant the following day, December 17, 2014, in the parking lot of the apartment complex where Bush lived; he was driving a silver Chevrolet Impala. Prior to the preliminary examination, a local newspaper published pictures of defendant, Bush, and Waters, identifying them as arrestees in the home invasion and armed robbery that occurred at Wilson's home.[2] Defendant appeared at the preliminary examination in jail attire and sat with Bush and Waters behind defense counsel. Wilson identified defendant as the man who held the gun to her neck and whom she had seen sitting in the car parked across the street from her mother's house on the day of the robbery.

Subsequently, defendant filed a motion for the appointment of an eyewitness expert "to testify about the foibles and mistakes" of eyewitness identifications. The prosecution opposed the motion, asserting among other things that defendant failed to show that the facts of the case required expert testimony. The prosecution also argued that publication of defendant's photograph in the newspaper was not a state action, and therefore, did not qualify as an unduly suggestive pretrial identification procedure, and that even if it did, Wilson had an independent basis for her identification. The trial court took defendant's motion under advisement.

The trial court conducted a *Wade* hearing on July 24, 2015. The court later issued a written opinion and order deeming Wilson's in-court identification of defendant at the preliminary examination "impermissibly suggestive." The Court based its decision on Wilson's having seen defendant's photograph in the local newspaper prior to the preliminary examination, coupled with the fact that defendant was sitting behind the defense table wearing jail garb. The court then conducted an independent-basis analysis and concluded that Wilson's opportunity to personally observe defendant's eyes in her well-lit home during the robbery constituted an independent basis for identifying defendant. In the same opinion and order, the court denied defendant's motion for an eyewitness expert, explaining that defendant had failed to show any special circumstances warranting an expert to assist the jury in examining the circumstances under which Wilson identified him.

Defendant's four-day trial began on October 6, 2015. In addition to Wilson's testimony, the jury heard from Markenya Crigler, who testified that defendant left her home on East Lafayette Street in Detroit at around 7:00 or 8:00 p.m. on December 14, 2016, driving a silver Chevy Impala owned by her daughter. Defendant telephoned her six or seven hours later, telling her that he had some items in the car and needed her help. Crigler testified that she met defendant at the front door of her apartment and retrieved some toys and a bag from the trunk of the car. Crigler said that defendant was wearing his brown, Carhartt-like work jacket. Detective Sergeant Melissa Stevens, supervisor of the major crimes unit of the Macomb County Sheriff's Department, later testified that when the investigation into the home invasion and robbery led her to Crigler's home, Crigler was cooperative and forthcoming,

and she consented to a search of her apartment. The search recovered items matching those taken from Wilson's home. Det. Sgt. Stevens also testified that she observed the sleeve of a brown Carhartt-type jacket sticking out of a partially opened closet in Crigler's apartment.

Shea Truxell, an officer with the Clinton Township Police Department, recounted that on the night of December 16, 2014, she and her partner were patrolling an area near Wilson's home when they received a call about a suspicious car just after 11:00 p.m. The car was a silver Impala driven by a black female later identified as Bush. Officer Truxell asked Bush to leave the area because residents were complaining about her parking there. One of the officers took down the Impala's license plate number and, upon learning that there had been a home invasion and robbery in the area, shared the number with the Macomb County Sherriff's Department. Members of the crime unit ran the plate numbers given them by Truxell, received a couple of associated addresses, and set up surveillance at each  address, one of which was Crigler's residence. Det. Sgt. Stevens testified that officers located the car at Crigler's residence and watched as defendant got into it and drove away. Detective Christopher Fraser, also of the Macomb County Sherriff's Department, testified that he and several other officers in unmarked cars followed the suspect car until they had enough information to make contact with defendant in the parking lot of Bush's apartment complex, where they arrested him.

Macomb County Sheriff's Deputy Daniel Cikota, a computer forensic examiner, testified that he extracted data from several cellphones associated with the charged crimes, including an Alcatel phone confiscated from defendant, a Samsung Galaxy phone confiscated from Bush, and an HTC phone confiscated from Waters. He also obtained phone records from the relevant service providers and compared them with the extracted data. The deputy testified that on December 17, 2014, at around 1:21 a.m., a message was sent from the HTC phone to the Alcatel phone asking, "When can I get my cut." Later that day, messages were sent from the HTC phone to the Alcatel phone stating, "let me get the rifle, plz for 50, $60. They say it was 480 in the purse[,]" and "And they got the car. Shit, they doing good." Deputy Cikota testified to messages sent from the Alcatel phone to the HTC phone stating, "Bum ass lick. What do you expect from it[,]" "That shit was a waste of my time, Bro ...[,]" and "Fuck the TV. I get down for

5

the cash, Bro, for work. That a waste of my time." In addition, Deputy Cikota testified to text messages sent from the Samsung Galaxy phone to the Alcatel phone on December 16, 2014. Two of the messages were sent around the time of the home invasion and robbery; a message sent at 11:19 p.m., around the time Truxell asked Bush to move her car, stated that the police were there. Deputy Cikota acknowledged under cross-examination that his analysis of the messages did not necessarily reveal who sent and received the messages.

Joseph Duncan, an investigator with the Macomb County Prosecutor's Office, testified to the results of his analysis of the records for the phones confiscated from defendant, Bush, and Waters. He testified that a number of calls from the HTC phone to the Alcatel phone made between 9:10 p.m. and 9:48 p.m. on the night of the incident pinged off a cell tower near where the home invasion occurred, indicating that the Alcatel phone was in that vicinity. Duncan also testified that calls between the Alcatel phone and the Samsung Galaxy phone made during the 11:00 p.m. hour pinged in the same area, likely off the same cell towner. Duncan acknowledged under cross-examination that the records themselves did not show that a robbery took place.

After the close of testimony and over defendant's objections, the prosecution requested a jury instruction on aiding and abetting. Finding that the evidence supported an aiding-and-abetting theory, the trial court instructed the jury accordingly. Subsequent to his conviction and the imposition of sentence, defendant filed a post-trial motion for a *Ginther* hearing, a new trial, and correction of defendant's presentence investigation report (PSIR). The trial court denied the motion. Defendant filed in this Court a motion to remand, which the Court granted in part and remanded in part. The Court remanded the matter to the trial court to allow defendant to move for a new trial on the issue of whether jurors saw him in shackles, but denied the motion as to all other issues.

On remand, the trial court heard testimony from defendant and three of his relatives claiming that counsels' table during defendant's trial was akin to a picnic table and allowed jurors to see defendant's ankle shackles through the opening below the table's top. Defendant also testified that jurors once saw him in shackles when Deputy Jeffrey

Haase hurried him from the bathroom into the courtroom in advance of the approaching jurors, that he reported this to his attorney, and that his attorney told him not to worry about it. The prosecutor at defendant's trial, defendant's trial attorney, and Deputy Haase testified that no one brought any concerns regarding shackling to their attention. The prosecutor and the defense attorney testified that if there had been any question that a juror had seen defendant in shackles, even inadvertently, they would have investigated, made a record of the matter, and, in the case of the defense attorney, moved for a mistrial. Deputy Haase testified that he had no memory of the bathroom-to-courtroom incident defendant described and did not recall any time when the jury saw defendant in shackles. He also stated that court officers did not put incarcerated defendants in shackles during jury selection because potential jurors sitting in the gallery might see the shackles.

During a second hearing, Deputy Ralph Sauger, who served as extra security for a portion of defendant's trial, testified that he put shackles on defendant in the back, brought him into the courtroom, and sat him beside his attorney. He said that he did not remember being present for jury selection, but then answered affirmatively when asked whether defendant was wearing shackles during jury selection. Under cross-examination, Deputy Sauger clarified that when he earlier testified that he brought defendant into the courtroom in chains, he had meant after the jury had been selected, not when the jury gallery was full of potential jurors. Deputy Sauger said that jurors were not allowed to see defendants in chains, and defendants would not be shackled during jury selection if there were any chance that potential jurors could see the chains. He reiterated that he did not remember being present for jury selection, but said that if he had been present, he would have taken his instructions from Deputy Haase. If Deputy Haase said that defendant was to remain unshackled during jury selection, he would have followed those instructions.

The trial court denied defendant's motion for a new trial. The court did not find credible testimony indicating that the defense table at the time of defendant's trial was similar in style to picnic tables. Based in part on 15 years of experience in the same courtroom, the court found credible the testimony indicating that a partition had shielded defendant's legs from the jury during his trial. The court also did not find credible defendant's testimony about the bathroom-to-courtroom

incident with Deputy Haase and defendant's subsequent conversation with his trial counsel. Instead, the court credited the testimony of defendant's trial counsel that if such a situation had occurred, he would have made a record and moved for a mistrial. The court likewise found credible the testimony of the prosecutor during defendant's trial that he, too, would have made a record of the incident and, in the absence of such record, it was fair to infer that it did not occur. The court concluded that the evidence did not establish that any juror actually saw defendant in shackles, and that, although defendant said that the shackles affected his self-esteem, he had "failed to offer specific testimony as to how shackles actually hindered his ability to communicate with his attorney." The court concluded that shackling did not deprive defendant of a fair trial, and that defendant was not entitled to a new trial. The court also denied defendant's request to recall jurors for limited testimony on the ground that Deputy Sauger's testimony "failed to indicate that a prospective or seated juror saw defendant's leg shackles."

*People v. McCants*, 2018 WL 3440786, at *1-4 (Mich. Ct. App. Jul. 17, 2018)(footnotes omitted).

Following his conviction, McCants filed a claim of appeal. His appointed appellate counsel filed a brief on appeal that raised four claims:

I. The trial court erred and should have suppressed Brenda Wilson's identification of defendant McCants.

II. The trial court clearly erred and should have granted the defense request for an eyewitness expert.

III. Mr. McCants's trial counsel Adil N. Haradhvala failed to provide effective assistance of counsel.

IV. Defendant's presentence investigation report should be amended, removing information about his co-defendants in an Alabama death penalty case.

McCants also filed his own pro se supplemental brief that raised eight additional claims, some of which overlapped the claims raised in his appellate counsel's brief:

I. Trial counsel was constitutionally ineffective for failing to (1) investigate the cellphones, (2) properly cross-examine Brenda Wilson, (3) properly cross-examine MarKenya Crigler and Det. Sgt. Melissa Stevens, (4) move for suppression of evidence based on lack of jurisdiction, (5) move for disqualification of the biased judge, and (6) object to the amount of restitution.

II. There was insufficient evidence to convict the defendant of unlawful imprisonment, in violation of the Fourteenth Amendment.

III. The trial court's refusal to appoint substitute trial counsel violated the Sixth Amendment.

IV. The prosecutor (1) withheld exculpatory evidence and (2) knowingly presented false testimony, in violation of the Fourteenth Amendment.

V. The trial judge was biased against defendant, in violation of the Fourteenth Amendment.

VI. Police searched defendant's phone without a warrant, in violation of the Fourth Amendment.

VII. The jury instructions on aiding and abetting violated defendant's Fourteenth Amendment right to fair notice of the charges against him.

VIII. Defendant was placed in shackles visible to the jury without justification, in violation of the Fourteenth Amendment.

The Michigan Court of Appeals remanded the case to the trial court for the trial court to hold an evidentiary hearing on McCants's motion for a new trial based on his shackling claim. Following the hearing, the trial court denied the motion.

Upon return to the Michigan Court of Appeals, the court rejected McCants's claims and affirmed his convictions. *McCants*, 2018 WL 3440786.

McCants subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims that he raised in the Michigan Court of Appeals. The Michigan Supreme Court denied the application by standard form order. *People v. McCants*, 935 N.W.2d 346 (Mich. 2019)(Table).

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal

principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.... As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

### III. Discussion

A. Identification Testimony

McCants's first claim challenges the admissibility of identification testimony by the victim. He claims that Wilson saw him seated at the defense table at the preliminary examination and saw his photograph in a newspaper article about the crime, and this constituted an impermissibly suggestive identification procedure that

rendered her subsequent trial testimony identifying him as her assailant unreliable. The trial court held a hearing on the claim, after which it found there was a sufficient independent basis for the identification. The Michigan Court of Appeals agreed, finding that Wilson had an ample opportunity to observe McCants during the 45 minutes to an hour he interacted with her during the robbery. *McCants*, 2018 WL 3440786, at *4-5.

This decision did not result in an unreasonable application of the established Supreme Court standard. The Due Process Clause requires suppression of eyewitness identification evidence only "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012)(quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). A pretrial identification procedure violates due process where: (1) the identification procedure is impermissibly suggestive; and (2) the suggestive procedure gives rise to a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 197-98 (1972); *Manson*, 432 U.S. at 114 (holding that due process challenges to identification procedures are reviewed using the *Biggers* test).

A criminal defendant has the initial burden of proving that an identification procedure used by law enforcement during the investigation was impermissibly suggestive. It is only after a defendant meets that burden that the court must require the state to prove that the identification was reliable, independent of the suggestive

identification procedure. *United States v. Wade*, 388 U.S. 218, 240, n. 31 (1967). If a defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification is otherwise reliable, no due process violation has occurred. As long as there is no substantial likelihood of misidentification, it is for the jury to determine the ultimate weight to be given to the identification. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

Even when there is undue suggestibility in a pretrial identification process, suppression is not called for if the in-court identification is reliable. "The factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Sexton v. Beaudreaux*, --- U.S. ---, 138 S. Ct. 2555, 2559, 201 L. Ed. 2d 986 (2018)(quoting *Manson*, 432 U.S. at 114).

The state court decision is supported on two bases. First, Wilson was never subjected to any pretrial identification procedure conducted by law enforcement. There was no live line up or photo array procedure. The alleged suggestive identification procedure is the fact that McCants was seated at the defense table during the preliminary examination, and the fact that Wilson saw McCants's

photograph in a newspaper article about the crime. The Supreme Court has found that a witness's identification of a defendant at a preliminary examination not to be a due process violation absent improper state conduct. As explained in *Perry*, "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Perry*, 565 U.S. at 232. When no improper law enforcement activity is involved, "it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id*. at 233. So too, there is no allegation that law enforcement asked for the newspaper to publish McCants's photo. The state court decision did not contravene Supreme Court law where the alleged pretrial identifications did not involve improper law enforcement activity.

Even assuming the pretrial confrontations counted to trigger further inquiry, the state court reasonably concluded that Wilson's identification was nevertheless reliable. Wilson saw McCants twice on the date of the robbery. On the first occasion, Walker was especially attentive to a car and people she did not recognize on her street. (ECF No. 13-11, at 22-23.) It was still light out at the time, she was wearing

her glasses, and nothing impeded her ability to see the people. (*Id.* at 25-26.) She got a "good look" at one of the individuals who was wearing a Carhart coat, and she later recognized him as the same person who robbed her. (*Id.* at 25-27.) Later that night, as she was about to go inside her house, a man in a Carhartt coat pointed a gun at her. (*Id.* at 29-32.) The man wore a mask that covered some of his face, but Walker could see his eyes. (*Id.* at 30.) The man interacted with her inside her house over an extended period of time. (*Id.* at 33-34.) She looked him "dead" in the eyes, and she recognized him as the same man she had seen without the mask earlier. (*Id.* at 29–32). Wilson was "100 percent sure [McCants] was the one that put the gun to [her] neck." (*Id.* at 28.)

Walker's two opportunities to observe McCants, the length of the second interaction, the observing conditions inside her house, and her expressed certainty, all provided the state court with a  reasonable alternative basis to reject McCants's claim consistent with the established Supreme Court standard. The claim is without merit.

B. Ineffective Assistance of Counsel

McCants's second and fourth claims assert numerous allegations of ineffective assistance of trial counsel. He claims that his trial counsel was ineffective for: (1) failing to investigate evidence held by police, (2) failing to interview the men found driving the victim's car, (3) failing to investigate cellphone data, (4) failing to

effectively cross-examine prosecution witnesses, (5) failing to move for suppression of evidence, and (6) failing to challenge the amount of restitution ordered during sentencing.

The Michigan Court of Appeals rejected the claims on the merits:

Defendant next argues that his attorney rendered ineffective assistance when he refused to go to the evidence room to examine evidence that would be presented at trial, did not ask for a cellphone expert to refute the prosecution's case, and did not investigate the men found driving Wilson's stolen car. Defendant asserts that, but for counsel's allegedly deficient performance, there is a reasonable probability that the result of the trial would have been different. *Strickland*, 466 U.S. at 694. However, defendant's unsupported assumption that further investigation would turn up evidence beneficial to his case does not constitute an actual showing of prejudice, without which defendant cannot prevail on his claim of ineffective assistance. *See People v. Pickens*, 446 Mich. 298, 314 (1994).

\*\*\*

Defendant raises a number of additional ineffective assistance claims in his standard 4 brief. He first contends that his trial counsel provided ineffective assistance by failing to investigate the cellphones upon which the prosecution relied to place defendant at the scene of the crimes. He asserts that proper investigation would have shown that he did not take the picture of him with Bush that was on the Alcatel phone, but that Bush sent the picture to the phone, and that this would have undermined the notion that the Alcatel phone belonged to him. Contrary to defendant's expectation, there is no reasonable basis to believe that this discovery would have changed the outcome of the trial. The picture of Bush and defendant played no role in the prosecution's case against defendant, and it is not reasonable to infer that the Alcatel phone did not belong to defendant simply from the fact that Bush sent the photograph of her and defendant to the phone.

Defendant next contends that investigation of the phones would have revealed that defendant was not in Mount Clemens between 5:00

and 5:30 p.m. on the day of the robbery. Assuming for the sake of argument that defendant is correct, it would not undermine the prosecution's evidence that defendant was in Mount Clemens during the time of the robbery, and that texts between Waters and defendant, as well as Crigler's testimony, provided incriminating evidence of defendant's involvement in the robbery. Thus, even if further investigation of the cellphones revealed what defendant says it would, it is mere speculation that the result of the proceeding would have been different.

Defendant further argues that his attorney rendered constitutionally ineffective assistance with inadequate cross-examinations of Brenda Wilson and her son, Randy Wilson. Defendant's contention with regard to Randy Wilson is without merit. Randy testified as a defense witness and was not subject to cross-examination by defense counsel. Defendant has pointed to no deficiencies in counsel's examination of Randy. With regard to Brenda Wilson, defendant does not indicate in his main brief how counsel's cross-examination was deficient. He contends in his standard 4 brief, however, that he and his attorney agreed on a trial strategy that included undermining Brenda's credibility, but counsel did not execute this strategy; instead, counsel missed several opportunities to point out the inconsistencies in Brenda's testimony.

Our careful review of the record convinces us that defense counsel did in fact pursue the strategy of attempting to undermine Wilson's credibility, and that the deficiencies defendant alleges pertain primarily to tactical decisions counsel made in pursuit of that strategy. Just as we refrain from second-guessing trial strategy, *see Payne*, 285 Mich. App. at 190, we similarly decline to second-guess tactical decisions used to execute that strategy. That a chosen strategy proves unsuccessful is not grounds for an ineffective assistance claim. *People v. Petri*, 279 Mich. App. 407, 412 (2008). Moreover, even if counsel's cross-examination of Wilson had fallen below an objective standard of reasonableness under prevailing professional norms, defendant has not shown that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. Without Wilson's testimony, the prosecution presented ample testimonial and forensic evidence that implicated defendant as one of the perpetrators of the charged crimes.

Next, defendant charges trial counsel with providing ineffective assistance by failing to cross-examine Markenya Crigler with questions that would have revealed that police manipulated and coerced her into accusing defendant of bringing stolen items to her house and that her anger at defendant motivated her to lie about defendant dropping off stolen items. This charge is without merit as our review of the record shows that defense counsel did indeed employ a strategy aimed at undermining Crigler's credibility. The jury was free to assess Crigler's credibility, weigh the evidence, and draw inferences from the evidence. *See People v. Gillard*, 216 Mich. 461, 470 (1921). That the jury did not arrive at the conclusions defendant thought it should does not mean that his attorney's performance was objectively deficient. *See Petri*, 279 Mich. App. at 412, 760.

Defendant next asserts that trial counsel rendered ineffective assistance by failing to move for suppression of the evidence Det. Sgt. Stevens obtained outside of her jurisdiction and without informing local law enforcement. Assuming for the sake of argument that Det. Sgt. Stevens violated Mich. Comp. Laws 764.2a9 by obtaining evidence outside her jurisdiction, a statutory violation does not render police action unconstitutional. *People v. Hamilton*, 465 Mich. 526 (2002), abrogated on other grounds by *Bright v. Ailshie*, 465 Mich. 770 (2002). And absent a constitutional violation, the remedy for a statutory violation is not exclusion of the evidence. *People v. Clark*, 181 Mich. App. 577 (1989)(holding that exclusion of the evidence is not appropriate where it is premised solely on a violation of Mich. Comp. Laws 764.2a, the purpose of which is to protect the rights and autonomy of local governments, not the rights of criminal defendants). In light of *Hamilton* and *Clark*, trial counsel did not render ineffective assistance by failing to raise a jurisdictional violation issue that would not have resulted in exclusion of the evidence. *Mack*, 265 Mich. App. at 130 (failing to advocate a meritless position does not constitute ineffective assistance).

*McCants*, 2018 WL 3440786, at *7-9.

The decision was a reasonable application of the clearly established Supreme

Court standard. The Sixth Amendment guarantees a criminal defendant the right to

the effective assistance of competent counsel. An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688)(quotation marks omitted). And where the challenged conduct amounts to legitimate trial strategy, habeas courts will not find that counsel performed deficiently. *Robins v. Fortner*, 698 F.3d 317, 337-38 (6th Cir. 2012).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id*. at 694. Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare because the Strickland standard is "'difficult to meet.'" *White*, 572 U.S. at 419 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013)). Under AEDPA, the standard for obtaining relief under *Strickland* is very difficult to meet because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). This doubly-deferential standard requires the Court to give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

Most of McCants's claims were reasonably rejected because they were based on speculative and conclusory allegation that failed to proffer a plausible basis for finding prejudice. For example, McCants argued that his counsel failed to investigate evidence that was in the possession of law enforcement, but he failed in the state courts and fails here to identify the nature of the allegedly unexamined evidence or

how an examination would have been beneficial to the defense. The same thing holds true for the alleged failure to interview the men found in possession of the victim's car. McCants offered neither the state courts nor this Court with any proffered statements of affidavits from these individuals to demonstrate the possibility of actual prejudice. Unsupported and undeveloped allegations such as these fall short of establishing ineffective assistance of counsel. *See Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005)(affirming denial of an ineffective assistance claim based on counsel's failure to interview and call witnesses where the petitioner did not "introduce[] affidavits or any other evidence establishing what they would have said.") Similarly, McCants does not explain how an investigation of the cellphones would have benefitted the defense. He makes no proffer to support his allegation that his cellphone was in a different city at the time Walker testified she first saw him on the street. And contrary to his claims, a police witness testified to cellphone data indicating that the phones were in use in the area of the victim's house at the time of the crime.

McCants also claims that his counsel should have more forcefully cross-examined the victim regarding perceived inconsistencies between her testimony and her prior statements. Yet, as noted by the state court, the allegation ignores the fact that counsel chose to attack the credibility of the victim by challenging her ability to accurately identify the perpetrator. Counsel did this, in part, by using her prior

statements. (ECF No. 13-13, at 100-122.) Suggesting that the sympathetic victim of a violent crime was simply mistaken rather than asserting she was purposely embellishing upon her earlier statements is exactly the type of tactical decision to which *Strickland* deference applies. So too, counsel adequately cross-examined Crigler regarding her testimony that McCants brought the stolen items to her home. Counsel suggested that Crigler was motivated to falsely testify against McCants because police had told her that he was cheating on her before she made her statement. (ECF No. 13-13, at 152-53.)

With respect to the alleged failure to move for suppression of evidence based on the argument the officer did so outsider her department's jurisdictional borders, the state court noted that the alleged state-law violation did not provide a viable basis for suppressing the evidence. That determination of a state-law question cannot be second guessed here. *Markham v. Smith*, F. App'x 323, 325 (6th Cir. 2001). Counsel is not ineffective for making meritless motion. *Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008)("No prejudice flows from the failure to raise a meritless claim.").

The same holds true for McCants's claims that his counsel should have objected to the court's restitution order. The Michigan Court of Appeals found that the restitution amount was correct. *McCants*, 2018 WL 3440786, at *7-9. The state court's determination that the restitution amount was proper is another state-law determination by a state court. Accordingly, the state court properly rejected these

allegations on the grounds that counsel was not ineffective for failing to make meritless arguments.

McCants's ineffective assistance of counsel claim was reasonably rejected by the state courts and does not provide a basis for granting habeas relief.

C. Shackling

McCants's third and eleventh claims assert that he was denied a fair trial when the jury saw that he was restrained with shackles during jury selection and trial. The claim was raised in the Michigan Court of Appeals, and that court remanded the case to the trial court to hold an evidentiary hearing. After hearing testimony, the trial court made a factual finding that the jury was unable to view the leg restraints placed on McCants because of the wooden skirting around counsel's table. The court further found that McCants was not shackled during jury selection, so there were no restraints for prospective jurors sitting behind the table to see. Because McCants has not refuted these presumptively correct factual findings by clear and convincing evidence, he has failed to demonstrate entitlement to habeas relief. 28 U.S.C. § 2254(e).

After the remand hearing, the Michigan Court of Appeals denied the claim on the merits:

> Defendant contends that the evidence presented on remand established that he wore shackles during his entire trial, including during voir dire, and that the courtroom was so configured as to allow jurors to see his shackles. Because of this, defendant argues, his right

to due process was violated and he is entitled to a new trial. If not a new trial, he is entitled at least to a second remand so the trial court can conduct in camera juror interviews to determine whether jurors saw defendant's ankle shackles, whether they discussed the shackles during deliberations, and whether the shackles influenced their verdict. We again disagree.

We review a trial court's decision to shackle a defendant for an abuse of discretion under the totality of the circumstances. *Payne*, 285 Mich. App. at 186. "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v. Yost*, 278 Mich. App. 341, 353 (2008). Whether a defendant has been deprived of due process is a question of law subject to de novo review. *People v. Odom*, 276 Mich. App. 407, 421 (2007). To establish a due process violation that requires reversal of a conviction, the defendant must prove prejudice to his defense. *People v. McGee*, 258 Mich. App. 683, 700 (2003).

"Freedom from shackling is an important component of a fair trial." *People v. Dixon*, 217 Mich. App. 400, 404 (1996). "[A] defendant may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *Payne*, 285 Mich. App. at 186 (internal quotation marks and citation omitted; alteration added). Absent individualized findings regarding the necessity of shackling defendant, the trial court abuse[s] its discretion by requiring defendant to wear shackles in the jury's presence. *Id*. at 186-187. "But even if a trial court abuses its discretion and requires a defendant to wear restraints, the defendant must show that he suffered prejudice as a result of the restraints to be entitled to relief." *Id*. at 186. The inability of the jury to see the restraints negates prejudice. *People v. Horn*, 279 Mich. App. 31, 36 (2008). Even if "jurors inadvertently see a defendant in shackles, there still must be some showing that the defendant was prejudiced." *Id*. at 37.

Our review of the record reveals no violation of defendant's due-process rights and, therefore, no error in the trial court's denial of defendant's motion for a new trial on constitutional grounds.[10]

On appeal, defendant relies primarily on the testimony of Deputy Sauger to support his contention that he wore ankle shackles during voir dire and that potential jurors sitting in the gallery could see the shackles. Although Deputy Sauger's testimony is at times confusing, viewed as a whole, it does not support a finding that defendant wore ankle shackles during voir dire or that jurors saw him in shackles at any time during the course of the trial. Deputy Sauger testified confidently that the jury must not see a defendant in shackles, that defendants were not shackled during voir dire if there was a chance that potential jurors in the gallery could see the shackles, and that he followed Deputy Haase's instructions. Deputy Haase testified unwaveringly that incarcerated defendants were unrestrained during voir dire. Thus, the testimony of these two deputies, viewed as a whole, provides no evidence that jurors saw defendant's ankle shackles.

Defendant relies on *People v. Davenport*, 488 Mich. 1054 (2011) to contend that he is entitled to a remand to allow the court to conduct in camera interviews with his jurors to determine whether any saw him in shackles and, if they did, whether seeing his shackles affected their deliberations and decision. In our view, however, the Michigan Supreme Court's order in *Davenport* does not compel us to order a second remand of the case at bar. The Supreme Court remanded Davenport because this Court denied the defendant's motion for remand,[11] even though it was undisputed that defendant's left hand was chained to his waist throughout his trial, and video evidence showed that the shackles were visible.[12] After this Court affirmed the defendant's convictions, he applied for leave to appeal in the Supreme Court. In lieu of granting the defendant's application, the Supreme Court reversed this Court's decision and remanded the matter to the trial court to allow the defendant "to develop the record on the issue of whether his shackling during trial prejudiced his defense," *Davenport*, 488 Mich. at 1054, 794 N.W.2d 616.

Unlike in *Davenport*, in the case at bar, this Court granted defendant's motion for remand to allow him to move for a new trial on the issue of whether jurors saw him in shackles. Thus, defendant has had the same opportunity to establish prejudice that the defendant in Davenport had on remand. The type of hearings conducted by the two trial courts responded to the issues raised on remand. In *Davenport*, as already indicated, it was undisputed that the defendant was shackled

25

and that his shackles were visible, the only question was whether they were visible to the jury. Accordingly, the trial court conducted hearings in which jurors were asked if they saw the defendant's shackles and to what effect. On remand in the case at bar, the trial court held two evidentiary hearings to give defendant the same opportunity to establish that shackling prejudiced his defense. He was unable to do so. Now, defendant urges this Court to order a second remand for a different type of proceeding, even though he failed to establish on his first remand that his ankle shackles were visible during trial, let alone visible to jurors, potential or seated. Under these circumstances, *Davenport* does not compel us to grant a second remand to give defendant yet another opportunity to establish what he was unable to establish during the two evidentiary hearings the trial court conducted on the first remand.

———

[10] Based on the record before this Court, it is indisputable that the trial court abused its discretion by shackling defendant without making individualized findings supported by the record that shackling was necessary. *People v. Payne*, 285 Mich. App. 181, 186 (2009). Trial courts are prohibited from routinely shackling defendants, *People v. Dunn*, 446 Mich. 409, 425 (1994), and a law enforcement official's mere preference for the use of restraints is not a sufficient reason for shackling a defendant, *People v. Banks*, 249 Mich. App. 247, 258 (2002). Shackling a defendant during trial is permitted only in extraordinary circumstances, *People v. Dixon*, 217 Mich. App. 400, 404 (1996), such as to prevent the defendant's escape, to prevent him from injuring others in the courtroom, or to maintain an orderly trial, *Banks*, 249 Mich. App. at 257. The written policy of the Macomb County Sheriff regarding "prisoner transport, court and building security" accurately reflects this law, and the testimony of Deputy Haase on remand indicates his awareness of the policy. However, Deputy Haase's testimony also indicates that shackling incarcerated defendants is routine and that the trial court considered whether it was necessary only when there was an objection. This practice does not accord with Michigan law. Nevertheless, as egregious as this abuse of discretion is, it is not outcome determinative. There is no due-process violation or cause to reverse in the absence of prejudice, and defendant did not establish that shackling prejudiced his defense.

[11] *People v. Davenport*, unpublished order of the Court of Appeals, entered May 8, 2009 (Docket No. 287767).

[12] *People v. Davenport*, unpublished per curiam opinion of the Court of Appeals, issued August 5, 2010 (Docket No. 287767), p. 2.

*McCants*, 2018 WL 3440786, at *10–12

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id*. at 629. *Deck's* holding, however, "concerned only visible restraints at trial." *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008). A trial cannot be viewed as fundamentally unfair when there is no evidence that the jurors were aware of the shackling of a defendant. *See Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009)(holding that a claim based on *Deck* "rises or falls on the question of whether the [restraint] was visible to the jury"). Where a restraint is not visible, there is no due process violation. *Leonard v. Warden*, 846 F.3d 832, 842 (6th Cir. 2017).

The state court determined that the jurors never saw McCants in his leg restraints. That conclusion is supported by the record evidence elicited at the hearing. At the hearing, McCants and several of his family members testified that jurors saw his leg restraints during jury selection and trial because the courtroom contained

tables that were open at the bottom, and jurors saw McCants's leg restraints when a deputy walked him to the bathroom. (ECF No. 13-17, at 34-42.)

   The assistant prosecutor who tried the case, Michael Servitto, testified that he did not recollect whether McCants was shackled or whether the jury saw him shackled. (ECF No. 13-17, at 8-9.) He testified, however, that if he had seen the jury observe shackles, he would have addressed it with the court and asked to question the juror or jurors.

   The courtroom officer, Jeffrey Haase, testified that defendants are not shackled during jury selection. (*Id*., at 20.) He explained that it was only after a jury is selected that a defendant is placed in leg irons for the remainder of the trial. He explained that precautions are taken so that the jury cannot see the leg irons. (*Id*. at 21.) There is a solid wood partition at counsels' tables that cover the lower half of the people seated. (*Id*. at 21.) The jury is also kept in a locked room in the back when they are not in the courtroom, and a defendant is transported to the holding cell only after the jury is in their room. (*Id*. 21-22.) Deputy Haase denied that jurors saw him take McCants to the bathroom in shackles. (*Id*. at 41.)

   Defense counsel, Adil Haradhvala, testified that he could not recall whether McCants was shackled during the trial. (*Id*. at 61.) Counsel testified that if the jury had seen McCants in shackles, he would have immediately brought it to the court's attention because it would be grounds for a mistrial. (*Id*. at 61-63.) Furthermore, if

McCants told him that a juror had seen him in the back in shackles – as he claimed, counsel would have brought it to the court's attention and made a record. (*Id*. at 64.)

The trial court indicated that the tables where the parties were seated had not changed in fifteen years. They were not separate opened-bottom tables, as described by McCants and his family members, but were the current tables which were covered by wood paneling. (Id. at 68-69.)

Deputy Ralph Sauger testified that he was assigned to provide extra security during the proceedings. (ECF No. 13-18, 8, 11.) Deputy Sauger testified that he was present when the jury had already been selected and could not recall being present for jury selection. (*Id*. at 13-16.) He testified that he would have made sure that the jurors could not see McCants in leg shackles, and if there were potential jurors in the gallery, he would not have been shackled. (*Id*. at 13-16.)

Based on this testimony, the trial court found that the jury never saw McCants in leg restraints. The factual finding by the state court that the restraints were not visible is binding on this Court unless the petitioner can show that it is clearly erroneous. *Earhart*, 589 F.3d at 349 (citing 28 U.S.C. § 2254(e)(1)). To counter the testimony of every other witness to testify at the hearing, and photographs of the courtroom which were admitted and showed closed-bottomed tables, McCants offers only his and family members' testimony that different tables were used. He does not present clear and convincing evidence establishing that the factual determination

made by the state court was incorrect. Accordingly, McCants fails to demonstrate

entitlement to relief based on this claim.

## D. Sufficiency of the Evidence

McCants's fifth claim asserts that insufficient evidence was presented at trial

to establish that he restrained the victim to satisfy that element of his unlawful

imprisonment conviction. The Michigan Court of Appeals rejected the claim on the

merits:

> As used in this statute, "'[r]estrain' means to forcibly restrict a
> person's movements or to forcibly confine the person so as to interfere
> with that person's liberty without that person's consent or without
> lawful authority." Mich. Comp. Laws 750.349b(3)(a). In *People v.
> Kosik*, 303 Mich. App. 146, 152 (2013), this Court found sufficient
> evidence for a rational jury to conclude beyond a reasonable doubt that
> the defendant secretly confined a victim where [t]he victim was taken
> against her will into a conference room. She was held there in an
> enclosed area that was not visible to anyone who may have been
> passing by or in the store. Defendant was standing in front of the door
> to the conference room. If the victim had tried to escape, defendant was
> within arm's reach of her and could have prevented her from doing so.
> The victim testified that she was frightened by defendant.
>
> In the case at bar, Wilson testified that a gunman forced her
> inside her home, ordered her into her living room, had her sit on her
> loveseat, and then instructed a co-perpetrator to zip tie her arms behind
> her back. While it is true that her hands came free from the zip ties,
> Wilson testified that she hid this fact from the robbers out of anxiety
> for what they might do if they discovered that her hands were free.
> Wilson said that defendant kept waving the gun around and threatening
> to kill her if she did not tell him what he wanted to know. At one point,
> the robbers left her alone in the living room, but it became clear that
> they meant her to stay put when one of them ordered another, "Go back
> in there and check on her." Defendant speculates that Wilson, a 68-year
> old grandmother, could have grabbed the gun the robbers left on a table

and held the three men at bay, or used her phone to call police. But it is just as likely that such daring would have resulted in Wilson's injury. If one views the options available to Wilson at that time as "[c]onflicts in the evidence," this Court is required to resolve them in favor of the prosecution. *Bennett*, 290 Mich. App. at 472.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the elements of unlawful imprisonment were met beyond a reasonable doubt. *Hampton*, 407 Mich. at 368. Either as the primary actor who held a gun to Wilson's neck and forced her into her home, into the living room, and onto a loveseat, or as an aider and abettor who ordered another to zip tie her hands, the evidence is sufficient to sustain defendant's conviction for unlawful imprisonment. Like the victim in Kosik, Wilson was forced into a space out of sight of anyone who could assist her and monitored to prevent her taking action adverse to the robbers.

*McCants*, 2018 WL 3440786, at *13-14.

This decision did not involve an unreasonable application of clearly established Supreme Court law. It is well established that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under the Due Process Clause, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). A federal court reviewing a state court conviction under the habeas corpus statute that is "faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any

such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith*, 565 U.S. 1, 7 (2011).

On direct appeal, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. That rubric "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id*. at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). The Sixth Circuit reads those cases as creating a gauntlet for state prisoners asserting a sufficiency-of-evidence challenge under the AEDPA: they must penetrate "two layers of deference to groups who might view facts differently" than a reviewing court on habeas review — the factfinder at trial and the state court on appellate review. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Central to the resolution of McCants's claim is the state court's rejection of one of its premises. McCants argued in the state courts that there was insufficient evidence that he "restrained" the victim because while he directed her inside her house at gunpoint and used zip ties and duct tape, he did not completely restrict her movements inside her house. The state court found, however, that the element of "restraint" did not require a showing that the victim was completely prevented from

moving. It is enough that a defendant forces the victim into another space out of sight of potential help and into an area where the defendant can exercise control over her. *McCants*, citing *People v. Kosik*, 303 Mich. App. 146, 152 (2013). The state court's construction of the element in dispute is a question of state law, and it is binding here. *See Johnson v. United States*, 559 U.S. 133, 138 (2010)("We are, however, bound by the Florida Supreme Court's interpretation of state law, including its determination of the elements ....").

Given the way the state court defined the restraint element, its determination that sufficient evidence was presented was reasonable. As recounted by the state court, evidence at trial indicated that the victim was forced inside her home at gunpoint. She was taken from outside, where someone might see she needed help, to a less visible location inside her home. Once inside, she was seated first at a loveseat, where one perpetrator attempted to zip tie her hands. She was then seated at a table, where her legs were duct-taped together. During the episode, McCants directed the victim and the other perpetrators, maintaining control over the event in a manner allowing the jury to conclude beyond a reasonable doubt that the victim was being restrained.   The claim is without merit.

E. Substitute Counsel

McCants's sixth claim asserts that he was denied substitute counsel. The state court denied the claim on the merits:

Defendant contends that the trial court erred when it denied his trial counsel's request to withdraw and to provide substitute counsel on the ground that there had been a complete breakdown of the attorney-client relationship. Defendant is incorrect. We review a trial court's denial of an indigent defendant's request for the appointment of substitute counsel for an abuse of discretion. *People v. Mack*, 190 Mich. App. 7, 14 (1991). A trial court has not abused its discretion if its decision results in an outcome within the range of reasoned and principled outcomes. *People v. Duncan*, 494 Mich. 713, 723 (2013).

Substitute counsel is warranted only where "a legitimate difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic" and where "substitution will not unreasonably disrupt the judicial process." *People v. Mack*, 190 Mich. App. 7, 14 (1991). Defendant's trial counsel explained to the court that the "relationship of trust and confidence between [defendant] and [his attorney] was lost forever" because defendant had filed a grievance against him with the Attorney Grievance Committee (AGC). Counsel said that there was a complete breakdown of the attorney-client relationship, that he and defendant no longer were on speaking terms, and that if convicted, defendant was certain to raise ineffective assistance of counsel claims against him and would probably bring a malpractice suit against him. Defendant told the court that he agreed with his attorney's trial strategy, but some of counsel's factual misstatements had caused him to lose trust in his attorney. In denying the motion to withdraw, the trial court did not find the grievance to be dispositive, thought defendant's technical disputes about some of counsel's misstatements at oral arguments insignificant, and opined that counsel's withdrawal would disrupt the court's trial schedule. The trial court stated that it was not convinced that the dispute between defendant and his attorney was about trial tactics or strategy.

After reviewing the record, we agree with the trial court and conclude that its denial of defense counsel's motion to withdraw and for appointment of substitute counsel was not an abuse of discretion. Questions of professional judgment and trial strategy are matters entrusted to counsel and do not justify substitution of counsel, *People v. Traylor*, 245 Mich. App. 460, 463 (2001), and here, defendant agreed with counsel's trial strategy. Defense counsel did misspeak at the hearing on his motion for an eyewitness expert when he said that

Wilson identified the robber who removed his mask briefly as defendant. However, nothing in the record indicates that the misstatement prejudiced defendant or that trial counsel did not have a firm grasp of the relevant facts; thus, we agree with the trial court that counsel's misstatement was insignificant. Defendant's objection to counsel's factual inaccuracy does not constitute a "[g]enuine disagreement between counsel and the defendant over the use of a substantial defense or a fundamental trial tactic [that would] satisf[y] the good cause requirement ...." *People v. Tucker*, 181 Mich. App. 246, 255 (1989), remanded on other grounds by *People v. Musick*, 437 Mich. 867 (1990). While it is true that defendant agreed with defense counsel that there had been a complete breakdown in the attorney-client relationship, defendant did not offer substantial reasons in support of this assertion. "[A] mere allegation that a defendant lacks confidence in his attorney, unsupported by a substantial reason, does not amount to adequate cause ...." *Tucker*, 181 Mich. App. at 255.

*McCants*, 2018 WL 3440786, at *15.

The decision of the Michigan Court of Appeals was neither contrary to nor an unreasonable application of clearly established federal law. The Sixth Amendment guarantees defendants in criminal cases the right to adequate representation, but not the right to be represented by a particular attorney. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Defendants who require counsel to be appointed for them do not have a right to counsel of choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). "[W]hen a defendant is denied the counsel he prefers, the constitutional concern is whether he received an

35

effective advocate." *Ray v. Curtis*, 21 F. App'x 333, 335 (6th Cir. 2001). Accordingly, an indigent defendant "must show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution" of counsel. *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985); *accord Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011). When evaluating a trial court's denial of a request to substitute counsel, a reviewing court considers the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the attorney and the defendant was so great that it resulted in a total lack of communication preventing an adequate defense. *Henness*, 644 F.3d at 321.

The record supports the state court's determination that McCants's motion for substitute counsel was properly denied. The issue arose at a July 24, 2015, pretrial hearing during which trial counsel moved to withdraw due to a breakdown in the attorney-client relationship. (ECF No. 13-11.) The trial court did not ignore the request but inquired into the basis for McCants's dissatisfaction with his counsel. The trial court asked McCants whether the request was based on a "difference over trial tactics." (*Id*. at 6.) McCants said the request was instead based on "trust issues," and that he agreed with his counsel's defense theory. (*Id*. at 8.) When asked to elaborate on the trust issues, McCants referred to a few misstatements his counsel made at a pretrial hearing. The court replied that the misstatements did not affect the

court's factual or legal analysis. (*Id*. at 9-10.) The trial court asked McCants if there were any other significant disagreements with his counsel, but McCants replied, "That's it." (*Id*. at 10.)

Accordingly, the record shows that the trial court conducted a probing inquiry into the grounds for McCants's request for a new attorney. Based on McCants's response that he had no substantial disagreement with his counsel's defense theory and, at bottom, he was only concerned with a few minor misstatements made at a pretrial hearing, the trial court reasonably concluded that McCants had not established a complete breakdown in the relationship with his counsel or that his counsel was providing ineffective assistance of counsel warranting substitute counsel. The claim was therefore reasonably rejected by the Michigan Court of Appeals.

## F. Suppression of Exculpatory Evidence

McCants's seventh claim asserts that the prosecutor suppressed exculpatory evidence. Specifically, he asserts that police retrieved data from the cellphones found on McCants and Bush that showed that they were not in the area of the robbery when it occurred.

The Michigan Court of Appeals rejected the claim as follows:

Finally, defendant argues that the prosecution committed a *Brady* violation by failing to disclose to the defense exculpatory evidence pulled from the cellphones confiscated from defendant and Taija Bush. Defendant claims that the evidence would have shown that the phones

were not in Mount Clemens from 3:00 to 5:30 p.m. on the day of the robbery, thus further undermining Wilson's identification testimony. He also claims that further investigation would have revealed that police transferred a photograph of Bush and him from Bush's phone to the Alcatel phone to make it look like defendant owned the phone and had made the incriminating text messages found on the phone. In addition, defendant contends that the prosecution failed to disclose that police searched the electronic content of the phone they confiscated from defendant before obtaining a search warrant. Defendant contends that had the prosecution revealed this evidence, it would invariably have led to a successful motion to suppress the evidence. We review these unpreserved issue[s] for plain error affecting the defendant's substantial rights. *People v. Carines*, 460 Mich. 750, 762 (1999).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, defendant must prove that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v. Chenault*, 495 Mich. 142, 150 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*.

To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). *Chenault*, 495 Mich. at 150.

Assuming for the sake of argument that the phone records contained evidence favorable to defendant because it could have impeached Wilson's credibility, defendant has not shown that the evidence was material. *See Chenault*, 495 Mich. at 150-151. Materiality asks whether, "in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 150-151 (quotation marks and citation omitted). Here, even without Wilson's identification testimony, the prosecution presented compelling evidence of defendant's guilt. Crigler's

testimony, supported by recovery from her apartment of items stolen from Wilson, the phone record evidence, and Truxell's testimony regarding contact with Bush at the time and in the vicinity of the charged crimes supports the conclusion that defendant committed the charged crimes and renders the verdict worthy of confidence. Defendant's claim that police transferred a photograph of him and Bush to the Alcatel phone to incriminate him is utterly without merit.

Defendant also asserts that he is entitled to a new trial because the prosecution violated his right to due process by knowingly presenting false testimony from Brenda Wilson and Det. Fraser. Regarding Wilson, defendant claims that a police report of the incident states that Wilson said she saw defendant from her mother's kitchen window at around 7:30 p.m., but the prosecutor allowed her to testify falsely at the preliminary examination and at trial that she saw him between 3:00 and 5:30 p.m. With regard to Det. Fraser, defendant alleges that the prosecutor failed to correct his testimony that he confiscated a phone from defendant, secured it as evidence, and then turned it over to Deputy Cikota, when in fact the detective searched through the phone prior to obtaining a warrant.

In light of our rejection of defendant's assertion that Det. Fraser illegally searched defendant's cellphone, we find no merit in his argument here. Regarding his claims about Wilson's testimony, regardless of what appears in an unsworn police report from the night of the incident, Wilson testified consistently under oath that she saw defendant seated in an unfamiliar car parked across the street from her mother's house at around 5:00 to 5:30 p.m., while it was still somewhat light outside. Nothing in the record refutes this; there is no indication that street lights were on (or were malfunctioning), and Randy Wilson testified that he could not see the three people who walked within 10 feet of him not because it was dark, but because they had pulled hoods up over their heads. Given these circumstances, the prosecutor had no reason to believe that Wilson's sworn testimony was untruthful and in need of correction.

*McCants*, 2018 WL 3440786, at *17.

The Due Process Clause requires the state to disclose to the defense favorable evidence that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1967). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-470 (2009). A reasonable probability in this context means "that the likelihood of a different result is great enough to undermine[] confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 75-76 (2012)(punctuation modified). There are three elements to a *Brady* violation, (i) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (ii) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (iii) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

McCants fails to demonstrate that the state court unreasonably decided his claim. The state court assumed the existence of the exculpatory evidence referred to in the claim, but in actuality, McCants proffered nothing whatsoever to the state courts nor to this Court supporting his claim that the cellphones contained data showing they were not in the area of the crime when it occurred. So too, no evidence was proffered to show that a police officer sent a photo from one phone to another.

Nevertheless, the state court reasonably found that McCants failed to demonstrate *Brady* prejudice. Even if McCants's phone was elsewhere at the time

the crime was committed, it would not have undermined the strong evidence of his guilt as outlined by the state appellate court. Items stolen from the victim's home were recovered from Crigler's apartment, which corroborated her testimony against McCants. Truxell's testimony regarding contact with Bush at the time and in the vicinity of the crime strongly supported the prosecutor's theory of the case. The text messages between McCants and the other perpetrators very strongly suggested that they were the men who committed the robbery. Finally, the victim testified that she was certain of her identification of McCants. The strong evidence of guilt unaffected by the allegedly withheld cellphone data allowed the state court to reasonably conclude that McCants failed to demonstrate prejudice.

Finally, to the extent McCants claims that the prosecutor offered false testimony from the officer and victim, he fails to establish that the testimony was false. The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153 (1972). To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). However, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a

claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

McCants fails to show that the testimony in question was indisputably false. He makes no showing that Detective Fraser actually searched the cellphone before obtaining the warrant to suggest that his contrary testimony was untrue. Likewise, there is no evidence that Wilson indisputably lied when she testified to seeing McCants outside her mother's house earlier in the evening than she said in her statement to police. Mere inconsistencies such as this do not demonstrate that testimony was indisputably false. *See Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009).

The claim is without merit.

G. Judicial Bias

McCants's eighth claim asserts the trial court was biased. He claims that his counsel told him that the trial judge thought he was guilty, and he refers to the court's adverse rulings and his lengthy sentence as evidence of bias. The claim was raised as part of McCants's ineffective assistance of counsel claim on direct appeal, and the state court rejected it as follows:

> A judge who is biased or prejudiced for or against a party may be disqualified, Mich. Ct. Rule 2.003(C)(1), upon a showing of actual bias or prejudice, *In re Contempt of Henry*, 282 Mich. App. 656, 680 (2009). Actual bias is "[g]enuine prejudice that a judge ... has against

[a defendant]." Black's Law Dictionary (10th ed.), p. 192. As evidence of the trial judge's actual bias, defendant offers a statement allegedly made by his counsel indicating that the judge thought he was guilty and ought to go to prison, the court's adverse rulings, and the length of his sentence. None of this is admissible evidence of actual bias. The statement defendant alleges of counsel is inadmissible hearsay, MRE 801(c); MRE 802, and the mere fact that the judge ruled against defendant is not a basis for disqualification, *see In re Contempt of Henry*, 282 Mich. App. at 680. In addition, defendant fails to cite any authority supporting his argument that a sentence within the recommended minimum guidelines shows bias. MCR 7.212(C)(7) (indicating that argument must be supported by citation to appropriate authority or policy). Because defendant has failed to establish grounds to disqualify the trial judge, his claim of ineffective assistance based on counsel's failure to seek disqualification of the judge fails.

*McCants*, 2018 WL 3440786, at *9.

In reviewing an allegation of judicial misconduct in a habeas corpus petition, a federal court must ask itself whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process. *Brown v. Palmer*, 358 F. Supp. 2d 648, 657 (E.D. Mich. 2005). To sustain an allegation of bias by a state trial judge as a grounds for habeas relief, a habeas petitioner must factually demonstrate that during the trial the judge assumed an attitude which went further than an expression of his or her personal opinion and impressed the jury as being more than an impartial observer. *Id.*. A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a significant degree before habeas relief could be granted. *McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985); *Brown*, 358 F. Supp. 2d at 657. The Supreme Court

has ruled that "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish judicial bias or misconduct. *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

McCants failed to present the state courts with any evidence that the trial judge was actually biased against him. Even if true, a statement from defense counsel to McCants that counsel thought the judge to believe him guilty does not constitute evidence of actual bias. Counsel's suspicions for how the trial judge viewed the case does not constitute evidence of bias. So too, McCants does not point to any *erroneous* adverse rulings to establish bias. And as the state court found, the court sentenced McCants to a term within the guidelines range – undermining his claim that he was given a harsher sentence due to judicial bias. This claim was reasonably rejected for a want of evidence or indication of actual bias on the part of the state trial court.

H. Search and Seizure

McCants's ninth claim asserts that there was an illegal search of the cellphones seized by police in violation of the Fourth Amendment. The Michigan Court of Appeals considered and rejected this claim on the merits by concluding that the evidence established that Bush consented to an inspection of her cellphone by Detective Fraser, and that Deputy Cikota did not inspect McCants's phone until after he obtained the warrant. *McCants*, 2018 WL 3440786, at *16. These determinations

were made by the state appellate court based on the record evidence presented to the trial court. *Id.*

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Stone v. Powell*, 428 U.S. 465, 494-95 (1976). "Michigan has a procedural mechanism which presents an adequate opportunity for a criminal defendant to raise a Fourth Amendment claim." *Robinson v. Jackson*, 366 F. Supp. 2d 524, 527 (E.D. Mich.2005). McCants raised his Fourth Amendment claim in the state courts and pursued relief there through his direct appeal. The state courts rejected the claim on the merits. He makes no allegations that presentation of his Fourth Amendment claim was frustrated by a failure of the state court procedures for presentation of that claim. Accordingly, review is barred under *Stone*.

## I.  Jury Instructions

McCants's final claim asserts that the trial court erroneously instructed the jury regarding aiding and abetting because he was not given notice that he would face that theory at trial, in violation of due process right to fair notice of the charges against him. The claim fails because aiding and abetting is not a separate criminal charge under Michigan law – it is a theory of liability. A jury instruction on aiding

and abetting is warranted under Michigan law depending on the evidence presented at trial, not based on the charging document. *See People v. Mann*, 395 Mich. 472, 476-77 (1975). McCants was put on notice, consistent with due process and Michigan law, that he could found guilty under an aiding and abetting theory when he was charged with the underlying offenses. *See Mosby v. Burt*, 2007 WL 1467258, at *22 (W.D. Mich. May 18, 2007); *see also, McLemore v. Bell*, 2010 WL 1247550, at *12 (Feb. 16, 2010)(magistrate judge's report adopted, 2010 WL 1247555 (E.D. Mich. Mar. 25, 2010).

Because none of McCants's claims merit habeas relief, the petition will be denied.

## IV. Certificate of Appealability

Before McCants may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)(citation and internal quotation marks omitted). The Court finds that

reasonable jurists would not debate the resolution of any of Benson's claims. The Court will therefore deny a certificate of appealability.

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, and 2) **DENIES** a certificate of appealability.

**SO ORDERED.**

s/Denise Page Hood
Hon. Denise Page Hood
United States District Judge

Dated:  September 6, 2023

47